[*General Term, April*, 1872.]

## LYMAN C. DRAPER AND WM. A. CROFFUT *v.* WM. H. MOORE ET AL.

Where a written contract was made between a firm and third persons, and one of the partners, without the knowledge or consent of the other members, fraudulently, as to them, afterward added to the agreement, signing the firm name to the addition, that such third persons, they having no knowledge of the fraud, should have the privilege, at any time within three months after a change in the firm, in any way affecting their interests, to purchase the property on hand owned by the firm and resulting from the fulfillment of the original contract upon specified terms:

*Held,* that such proposed contract is not invalid for want of consideration, nor void for want of power in the partner making it and signing the firm name thereto to bind the firm thereby.

The period of "three months after dissolution," in such case, is not three months after the firm *actually* dissolved, but three months after notice of dissolution was communicated to such third persons.

Such privilege of purchase may be revoked at any time within the three months, if revoked before acceptance.

Where there is not a preponderance of evidence that such proposition was so accepted before being withdrawn, a court will not grant a specific performance of the alleged agreement, but will, at most, give the parties a right to try the question of fact to a jury upon a claim for damages for breach of such contract.

A prayer for general and alternative relief, in a pleading under the code, entitles the court to grant the party any redress he may be entitled to upon the pleadings and evidence; and such prayer may be added, or the prayer, contained in the pleading, changed at any stage of the cause without terms, and without causing any delay in the progress of the case. The code is directory in its provisions as to prayer for relief.

A finding of the court, like the verdict of a jury, must respond to all the issues in the case, unless the finding on one issue concludes all others, and if such finding does not do so, no judgment should be rendered, and if rendered will be reversed, even though, as to the issues not passed upon, the court dismissed the cause without prejudice, the party affected thereby objecting to such dismissal.

*Stallo & Kittredge*, for plaintiffs.

*Hoadly & Johnson*, for defendants.

YAPLE, J.   This cause comes before the court on a motion for a new trial reserved.   The bill of exceptions contains all the evidence received on the trial by the court at Special Term.   The facts, out of which the suit grows, are substantially as follows: Lyman C. Draper, a resident of Madison, in the State of Wisconsin, had collected the materials for a book. He had known the defendant, William H. Moore, a book publisher of Cincinnati, for more than twenty years, and had confidence in his ability to publish and cause to be successfully circulated and sold a work such as he contemplated to prepare.   Accordingly, on August 1, 1868, Draper and Wm. H. Moore and James E. Moore, two of the defendants, entered into a written agreement for the publication, by the latter, of a work substantially like the one which has given rise to this controversy.   But, on the 1st day of June, 1869, the Moores and the defendant, Charles F. Wilstach, having formed a copartnership as Moore, Wilstach & Moore, the plaintiffs entered into another written agreement with them—Wm. H. Moore writing it and signing the firm name thereto—to furnish them the manuscript for a book to be called "What, How, and Why—an American Home Book for Town and Country," the title of which was afterward changed (and copyrighted) to "A Helping Hand for Town and Country—an American Home Book;" and the firm agreed to stereotype the plates for the same, copyright the work in their name, get out the book, push its circulation and sale by subscription through general agents and canvassers, and allow and pay the plaintiffs, at stated periods, a royalty of ten per cent. on the wholesale price of the book as furnished to such agents and canvassers.

When this agreement was entered into, there was a parol understanding, not incorporated into it and therefore no part of it, that Wm. E. Moore should see that Draper's interests should not be jeopardized, but that Moore should take care to protect him in case anything should happen tending to his injury.   But of this understanding Wilstach was not advised, from anything we can find in the evidence.   In due time the work was copyrighted by the firm and brought out; but returns of sales, etc., were not made to the plaintiffs as the contract required.

Prior to November 23, 1869, dissensions had arisen between the Moores and Wilstach, and their business seems to have been financially embarrassed.   Wm. H. Moore wrote to Draper to send him his (Draper's) duplicate of the contract, not saying what he desired it for, and Draper sent it to him.   On that day, Wm. H. Moore added to it a clause, or further stipulation, providing that if the firm should be changed within six months from that date, in any manner affecting the plaintiffs' interests, they, or either of them, should have the privilege, at any time within three months after such change, to purchase the plates and books on hand at cost, with the expenses of advertising, on a credit of three months, with approved security.   To this Moore signed the firm name, assuming to make the contract for the firm; and returned the contract, with such addition upon it, to Draper, who received and retained it.   Of this Wilstach was ignorant.   Then, on February 24, 1870, Moore executed, in the firm name and sent to Draper, who also received and kept it, an assignment of the copyright, in case plaintiffs should purchase the plates, etc., according to the modification written upon the agreement.   Of this Wilstach was also ignorant, until after the dissolution of the firm and the settlement of all the terms of such dissolution.

On March 25, 1870, notice of the dissolution (as of March 1), of the firm of Moore, Wilstach & Moore was

duly published, and Charles F. Wilstach advertised as the purchaser and successor of the firm property and business, of which changes the plaintiffs had no knowledge until in May, 1870, no notice having been sent to them.

Wilstach purchased all the firm property, effects, and contracts, including these plates, books, and copyright; and, in part consideration therefor, released the Moores from all liability for the firm debts. When the dissolution and settlement above spoken of took place, Wilstach did not find this Draper contract in the safe, where it belonged, and knew nothing of what Moore had done in the premises.

About the last day of May, 1870, Draper, having heard of the dissolution of the firm, came to Cincinnati, called upon Wilstach, desired an account to be made out of the business, with cost of plates and advertising, etc.; and states, in his deposition, that he informed Wilstach of his election to take the property, etc., according to the terms of the addition to the agreement of November 23, 1869; that Wilstach stated it was not binding on him, as Moore had no power or authority to make it, and had done it to defraud him, but did not refuse or accept the offer.

Other evidence in the case leaves it fairly doubtful, to say the least, whether Draper did, on the first day, notify Wilstach of his election to take the property on the terms named in the modified writing. He called for the account, etc., daily, until on June 2, 1870, Wilstach finally refused compliance with the terms of the addition to the contract, at the same time waiving a tender of performance of its terms by Draper.

On July 1, 1870, the firm of Wilstach, Baldwin & Co., composed of the defendants, Charles F. Wilstach, Frank H. Baldwin, and John S. Baker, was formed, they being the successors of Moore, Wilstach & Moore, and of Wilstach.

On July 21, 1870, they wrote a letter to Draper soliciting the continuance of the publication of his book with them.

This was after this suit was brought, and the plaintiffs declined the offer.

In their petition, the plaintiffs ask for $5,000 damages against Moore, Wilstach & Moore, for breaches of the contract while the firm continued, for not settling according to agreement, and for not "pushing" the work, as they had agreed to do by the terms of the contract. They also asked, making all the requisite averments to entitle them thereto, for a specific performance of the modification added to the agreement November 23, 1869, and February 24, 1870, and prayed *for all other proper relief in the premises.*"

Wilstach answered, setting up: .

1. That the addition to the original agreement, made by Moore on November 23, 1869, and the agreement founded upon it, made by Moore also, on February 24, 1870, were wholly without consideration and void.

2. That, if even valid, the proposals therein contained were withdrawn before acceptance by the plaintiffs.

3. That the proposal was not accepted by the plaintiffs within three months after the dissolution of the firm of Moore, Wilstach & Moore.

4. That such proposals were made without his knowledge, and disclosed, on their face, that they contemplated liquidating the business of the firm after it should be dissolved, which no partner has the power to do without the assent of his copartners, and which the plaintiffs were bound to know.

5. And that all the subsequent changes were made, between the plaintiffs and the Moores, with intent to cheat and defraud him, and to get the plates, books, copyright, etc., in the hands and under the control of Wm. H. Moore, who then contemplated going into the same business as Wilstach was engaged in, and who has since, with said James E. Moore and others, done so in the city of Cincinnati.

6. And that, as to the plaintiffs' claim for damages for not "pushing" the work, etc., he simply says that they "pushed

the sale, etc., as this defendant supposes, to an extent satisfactory to" the Moores " and their confederates, the plaintiffs."

He then asks for an injunction to restrain plaintiffs and Moores from interfering with the publication, etc., of the work; and that the writings of November 23, 1869, and February 24, 1870, be delivered up and canceled, but adds no prayer for general or alternative relief.

Baldwin and Baker adopt Wilstach's answer.

Both of the Moores are in default. They have neither answered the petition nor replied to Wilstach's cross-petition and answer. And it is clear, from William H. Moore's testimony, that even if he made the additions to the written contract solely from a sense of moral duty to Draper he acted unjustly to Wilstach. How true it is that, " No man can serve two masters."

The reply of the plaintiffs denies all fraud on their part, all knowledge of dissensions in the firm, or of William H. Moore's acting in bad faith toward his firm in the matter, and the testimony convinces us that this is true. The plaintiffs were guilty of and intended no fraud; and Charles F. Wilstach is fully as innocent as they. William H. Moore's conduct was fraudulent toward his partner, Wilstach, whether he intended it to be so or not.

The court below rendered a judgment, denying the plaintiffs' specific performance, and dismissing the action without prejudice to the bringing of an action for damages for breaches of the contract by the old firm, or to cancel the contract; to all of which the plaintiffs excepted.

It appears that the court expressly refused to hear any evidence upon the branch of the case involving the question of damages, holding that if it should become necessary to do so the cause would be referred; but it was not so referred.

The court also refused to consider the case in the light of the plaintiffs being entitled to a cancellation of the con-

tract, such relief not being prayed for specifically in the petition.

The plaintiffs then moved to set aside the judgment and for a new trial, which motion is reserved for decision here.

No objection was taken by demurrer or answer to the petition, because two causes of action were improperly joined, and such objection, if any existed, was therefore waived. Code, sec. 88.

In the determination of issues by a court, the same rule applies that applies to the verdict of a jury; all questions submitted by the issues must be responded to, unless the finding of one issue may conclude the whole, and where an issue is left unanswered, no judgment should be rendered. *Hanly* v. *Levin,* 5 Ohio, 228; *Powell* v. *Harter,* 5 Ohio, 259; *Hewson* v. *Saffin,* 7 Ohio, pt. 2, p. 232; *Martin* v. *Clinton Bank, etc.,* 14 Ohio 187.

In this case, the claim for damages based on an alleged violation, by the defendants, of the original contract, presented an issue distinct from all others alleged in the petition, a claim that the answer did not sufficiently deny. And it was error on the part of the court to render a judgment for the defendants, or dismiss the case without trying that issue. To do so against the plaintiffs' objection, was to exercise a power not within the discretion of the court.

Whether a party, who, in a pleading under our code, asks for specific and such other relief as he may be found to be entitled to after full hearing of his case, can be granted any proper relief without amending the prayer contained in his pleading, is an important question of practice.

Under the code, the party is bound to state all the facts going to make up his single cause of action, in *one count.* He can not subdivide his claim so as to present fictitiously, as might have been done under common law pleading, two or more causes of action. *Sturges* v. *Burton,* 8 Ohio St. 215. But to the code petition there must be a demand of the relief to which the party "*supposes*" himself entitled. Code, sec. 85, pt. 3. This prayer for relief, if not proper

upon the facts alleged, is not the subject of demurrer. The provision is evidently but directory. The code gives but one form of action—a civil action—and the right to but a single statement of the facts constituting a cause of action. At common law, the same facts often gave the party a choice of several remedies, to be obtained by bringing one or the other of several different actions. As this can not now be done, the party is to state the relief he asks. If not proper, or not the most appropriate in the opinion of the court, the proper relief will be granted.

In chancery, the bill always stated connectedly the parties' entire cause, and prayed for such relief as the pleader thought he would be entitled to. But experience soon demonstrated, that when the cause came to be fully heard, or even from the differences of opinion between counsel and court upon the case made in the bill itself, that a very different measure of redress was proper than that asked for specifically. Hence, there was almost always a necessity for a general prayer, that for alternative and general relief. This prayer, it soon came to be said, by chancellors and equity lawyers, was next in importance to the Lord's prayer. This was so, simply because it was impossible to foretell what relief would ultimately be found, or thought to be proper. The same necessity exists under the code, and it is not to be narrowly and technically construed, but liberally, for the purposes of justice.

This view is fully sustained by the case of *Davenport* v. *Sovil*, 6 Ohio St. 462. Our Supreme Court say: "There being in this petition a prayer for alternative and general relief, this court, and that to which it may be remanded, will be restricted to no particular mode or measure of relief, but will be entirely at liberty to adapt either to what may be demanded by the particular circumstances of the case as they may be developed."

In both the above respects, then, the court below erred in its proceedings. When, upon the pleadings and evi-

dence, a party is entitled to any relief, it is error to dismiss his case, and compel him to bring another action.

We need advert to but one thing before considering the questions of law raised by the case. The property in this work of the plaintiffs, by the contract, belonged to Moore, Wilstach & Moore. The stereotype plates, books, and copyright were theirs. The plaintiff's interest was a mere contract right to ten per cent. of the wholesale price of the book to general agents, or canvassers. Their sole rights of action, during the existence of the firm, for breaches of the contract, were at law for damages. They could not have compelled the firm specifically to perform the contract to print the books and push the sale, *Kemble* v. *Kean*, 6 Sim. Eng. Ch. 353; 2 Wat. Ed. Inj. 364, 365, (note), nor could they have compelled them to continue the partnership. But, upon the dissolution of the firm, the successors of the firm can not compel them to intrust their interests to such strangers, who may, in view of other aims' and ends, devote little care or attention to their interests. The business is brought to a stand-still—is at a dead lock—until some mutual arrangement, satisfactory to the parties concerned, can be made.

Accordingly, we find Wilstach, Baldwin & Co., on July 21, 1870, writing to plaintiffs to induce them to enter into such an arrangement with them. They anticipated the law, as experienced business men almost always do, and really make the law of a business, when they act intelligently with reference to its necessities and due requirements.

The right of the plaintiffs, then, to a rescission and cancellation of the contract was properly before the court for decision, and it could not dismiss the case without passing upon and settling the terms of such right.

We come next to consider the questions raised upon the addition to the original written contract.

If Moore had the power to make such addition in the name of the firm, and bind it thereby, and if its terms were accepted by the plaintiffs within the time limited for them

to do so, and the same was not withdrawn before acceptance, there was ample consideration for it. The plaintiffs would have obligated themselves to pay the cost price of the plates and books, and the expenses of advertising, in consideration of receiving them. This consideration was distinct from, and independent of, that of the original agreement. That contract was complete in itself.

June 2, 1870, was within the period (three months after the dissolution of the firm) given them to accept such contract. Grant, that on March 1, 1870, the firm was, in fact, dissolved; yet no notice thereof was published until March 25, 1870, till which time the partnership continued as to the plaintiffs, who had previous dealings with, and were interested in it. They had no notice, in fact, of the dissolution till after March 25, 1870. *Myers* v. *Standart,* 11 Ohio St. 40, 41.

Nor do we think there was a want of power in Moore, on November 23, 1869, while the firm was in existence, to make such a contract with innocent third persons, previously interested, as plaintiffs were, in the name of the firm, and bind it thereby. In view of the fact that a dissolution of the firm would give the plaintiffs a right to put an end to the further prosecution of the contract by the successors of Moore, Wilstach & Moore, and that plates, books, and copyright would then be left upon their hands, it might well have been an advantageous bargain to all the parties concerned. It was a contract between a firm, made by one of their number, as their agent, with parties interested with them in important property interests, and, upon its face, not prejudicial to the interests of any of them. 11 Ohio St. 40, 41.

The authorities cited by counsel for the defendants do not bear out the position they assume. They relate only to the authority and power of partners to bind the firm after dissolution, and when a partner may dissolve a partnership at his own instance. But the question upon the facts proved is, whether Wilstach did not withdraw this proposition of sale before the plaintiffs accepted it. The original contract was complete in itself. It contained no provision that, in

the event of a change in the firm, Moore was to arrange to protect the plaintiffs' interests. No such term bound the firm. The addition to the contract gave plaintiffs the option to purchase, within three months after a change should take place in the firm. They received this proposition only, and never wrote to anybody accepting it. It could not, then, have been enforced against them, and hence could be withdrawn at any time before acceptance, though a period of time for acceptance was given. *Boston and Maine R. R.* v. *Bartlett*, 3 Cush. 224.

The difference between a thing optional and one absolute makes the doctrine of this case applicable, rather than that contained in the cases cited for plaintiffs.

Now, plaintiffs' witness, Lewis French, a member of this bar, and their own attorney, taken by them to Wilstach the last of May, 1870, to secure their rights, swears that the plaintiff, Draper, at the first interview with Wilstach, asked to have a statement of accounts made out, in order to determine whether he would take the property, or not, and that Wilstach informed him then that the addition to the contract was not binding upon him; that it had been made by Moore alone, without his knowledge or consent, and with a view to defraud him. Frank H. Baldwin also swears to this, as does Mr. Wilstach himself; and they all say Draper made no offer to accept the terms of this addition to the contract on that day. He did, perhaps, the next day. But, at every interview, he was told Wilstach did not consider the change attempted to be made by Moore binding upon him. This, we think, was equivalent to a withdrawal of the offer before its acceptance by the plaintiffs. At all events, upon such a state of the evidence, it would not be safe for us to decree a specific performance of the contract, but we should, as we do, leave the plaintiffs to claim their remedy, in damages, for the breach, if they think they can sufficiently establish the contract before a jury.

But William H. Moore should make good to Wilstach all losses which the latter may sustain by reason of any

such possible recovery, and the prayer of his cross-petition, which does not ask for other relief, etc., may be changed, as prayers in all code pleadings may, and should be, at any time, without costs, and without being any cause for delay, at any stage of the proceedings.

A new trial will be granted, and the cause remanded to Special Term for further proceedings.